Vernon D. TOLLETT, Appellant,

v.

The STATE of Texas, Appellee.

No. 418–89.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 19, 1990.

Rehearing Overruled Nov. 21, 1990.

Randy T. Leavitt, Terrence W. Kirk, Austin, for appellant.

Ken Anderson, Dist. Atty., Georgetown, Robert Huttash, State's Atty., Austin, for the State.

Before the court en banc.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

WHITE, Judge.

This case concerns the application of Rule 81(b)(2) to "Rose" error. See *Rose v. State*, 752 S.W.2d 529 (Tex.Cr.App.1987–88). More specifically, it requires us to decide what it means for an error to make a "contribution ... to the punishment." See Tex.R.App.P. 81(b)(2).

Appellant was convicted for aggravated sexual assault of his 10–year old son. He pleaded guilty before the jury and received a sentence of ninety-nine (99) years in prison. On appeal, the Third Court of Appeals affirmed his conviction. *Tollett v. State*, 727 S.W.2d 714 (Tex.App.–Austin, 1987). We reversed the Third Court, holding that it had been error for the trial court to

submit the parole law charge mandated by Art. 37.07 § 4(a), V.A.C.C.P. *Tollett v. State*, 761 S.W.2d 376 (Tex.Cr.App.1988). On remand, the Court of Appeals again affirmed appellant's conviction, finding that *no* actual harm had resulted from the error. *Tollett v. State*, No. 3–86–010–CR (Tex.App.–Austin, delivered January 19, 1989). We then granted appellant's second Petition for Discretionary Review to determine whether the Court of Appeals erred in its application of Rule 81(b)(2) to the facts of this case. We will affirm the judgment of the Court of Appeals.

As we begin our analysis to determine whether the inclusion of the parole law charge was harmless error, we note that this is not the typical case in which the effect of the parole charge on the jury's verdict must be gleaned from circumstantial evidence. See *Arnold, et al. v. State*, 786 S.W.2d 295 (Tex.Cr.App.1990). In this case, two jurors testified at a hearing on a motion for new trial and described the jury's deliberations. The two testifying jurors also revealed some of the mental processes followed to arrive at the punishment verdict. Although all or part of the juror testimony adduced at the Motion for New Trial hearing may have been objectionable, no suitable objection was lodged by the State and the evidence is now before us.[1] It will be helpful to take note of some relevant *Arnold* factors in order that we may interpret the juror testimony in its proper context.

Both appellant and the State agree that the facts of this case were unusually heinous. Appellant repeatedly sexually assaulted his eight year old daughter and his ten year old son over a period of about ten months. (The offense concerning the

daughter was not consolidated for trial with this case, but a great deal of evidence concerning the girl's molestation was nevertheless introduced). As the State asserts in its brief, the appellant's written statement which was admitted into evidence is probably the best summary of the facts.

> About 10 months ago I began sexually molesting my son and daughter, E\_\_\_\_ age 10 and M— age 8. The times varied between molestations. Primarily with my daughter—M—approximately 10 or 12 times and E— I guess about 7 or 8 times. I fondled M—'s vagina and sometimes penetrated her with my finger but not everytime & made M— fondle my penis. I would sometimes kiss her vagina. One time I made E— and M— have intercourse with each other while I watched I was nude. I penetrated E—'s anus with my finger while they were having intercourse together. There was a time that I made both E— and M— suck me at the same time. With E— I'd usually make him suck me or do the same thing to him. Sometimes we would masterbate each other. I'd usually get real close and I'd make the kids go in the other room and I'd go to the restroom and finish by masterbating myself.

Other evidence indicates that this confession may underrepresent the extent of appellant's abuse. Appellant's therapist testified that appellant had told him that he had made the children have sex with each other "numerous times." Additionally, the physician who examined E— testified that appellant's son told him that appellant would "whup" him "with a belt" in order to force him to engage in the incestuous acts. The

---

1. Rule 606(b) of the Texas Rules of Criminal Evidence currently governs the admissibility of juror testimony concerning the validity of a verdict. *Rose*, 752 S.W.2d at 536 (opinion on original submission). That rule, however, carries an effective date of September 1, 1986, and the new trial hearing in question was held in November, 1985. Before the Rules of Criminal Evidence took effect, former Arts. 38.01 and 38.02, V.A.C.C.P. mandated that Texas' civil rules of evidence would govern in criminal cases to the extent that they did not conflict with the Code of Criminal Procedure or the

Penal Code. Under the civil rules, all or part of the two jurors' testimony may have been inadmissible. On the other hand, their testimony may have been admissible under former Art. 40.03, V.A.C.C.P., as was similar testimony in cases before the advent of the parole law charge. We mention all of these arguments in order to stress the irregularity of the situation at hand, given the current state of the law. None of the foregoing arguments were advanced by the State, and they are not before us at this time.

very heinousness of these acts is in itself, of course, "a slippery indicator for gauging how a jury evaluated conduct of appellant in assessing punishment." *Arnold, supra,* at 312. But this record does offer us some guidance as to why the jury was able to focus on the maximum sentence available before beginning to take parole laws into consideration.[2]

We now turn to an examination of the testimony from the new trial hearing. Two jurors testified—Cynthia May and Hank Taylor, the jury foreman. May testified that she had discussed the case with appellant's attorney after the trial. He had asked her to sign an affidavit stating that the jury's punishment verdict of 99 years had been based on a desire to see appellant spend 33 years in prison. She stated that she had refused to sign because she "didn't want to get involved" and because she had no desire to undo anything she or the jury had already done. When asked point blank if the jury had voted for the 99 year sentence out of a desire to see appellant serve 33 years, she replied "I do believe that's a misinterpretation of my statement." In explaining what she really meant, May said

> I—I guess what it boiled down to was we were taking into consideration a third of the sentence, *and giving him 99 years over life was the deciding factor.* If he were to get out, we wanted to keep him off the streets for as long as possible. And that's where the difference between—because we knew life was 20 years, and we figured a third of the sentence for 99 years was 33, and that's how we arrived at the sentence for 33 years.

At one point in the deliberations, the jury sent a note to the judge which read: "Judge Lott: The Jury would like to know in specifics what a life sentence consists of in regards to time served or probation. /s/ Hank Taylor Jury Foreman". May testified that the jury had already decided to assess a punishment of 99 years or life when that note was dispatched; they were simply trying to determine which would be

"the longest sentence possible." She said that in a relatively short period of time the jury came to the consensus that it wanted to put appellant away "for as long as possible", and that no one was holding out for a lesser sentence; all quickly agreed that appellant should be given the maximum sentence. The jury made this decision, she claimed, based on a weighing of what was best for society, what was best for the victims, and what was best for appellant.

Hank Taylor's testimony shed further light on the jury's consideration of the parole law. His testimony ran as follows. After spending 20–30 minutes choosing a foreman, the jury began a roundtable discussion in which each person at the table was supposed to give his or her opinion of an appropriate punishment for appellant "no matter how ridiculous it might be or what [an individual juror] want[ed]." Taylor began the discussion by suggesting 20 years, apparently not because it was his honest opinion, but because he did not want to unduly prejudice the other members of the jury by starting discussions at the high end of the punishment range. As Taylor said "I did not want to throw things out of kilter." The second juror said that he could "go along with" Taylor's recommendation. The third juror said that she was for a stiff sentence—she didn't know how long, but a stiff sentence nevertheless. The fourth juror mentioned a higher number of years than had first been suggested —"sixty years or longer" as Taylor recalled it. When they got around to the sixth or seventh juror, one woman stated that "if she could assess a death penalty she would." Taylor admonished her that "that's a little bit hard in this case, I think" and the discussion continued. After the suggestion of death, the proposals went "from there to life—99 years was mentioned." One of the last few jurors to speak was for some form of castration. Taylor commented at the new trial hearing "[t]hat was not obviously in the paper." By this time all the jurors had spoken, and it was again Taylor's turn to speak. He then opined that he had "no hang up with a

2. Before delving into the jury's actual deliberations, we also note that no mention of parole law was made during voir dire or final arguments.

life sentence or 99 years or a stiff sentence." The second juror said that he "had no qualms with a life sentence or the stiffest possible sentence." Another juror who had stated upon the first go-around that she thought the sentences being discussed were "too harsh" said that she would now go along with "a life sentence or 99 years." She stated that she had been playing "the devil's advocate" at first but that she would now agree to a maximum sentence.

Taylor described the intent of the jury at this point: "we were trying to assess the maximum—the stiffest possible sentence. No questions; no ifs, ands, or buts. That's what we were looking for." It was at this time, according to Taylor's recitation of the facts, that the jury began to consider what a life sentence meant in terms of time to be served, and hence began their discussion of the parole laws. Because they were confused about the meaning of a life sentence, they sent their note to the judge. Before receiving an answer, they erroneously decided that a 99 year sentence would assure that appellant spent longer in prison than a life sentence would require, so they assigned punishment of 99 years.

■ The trial court and the Court of Appeals found that the jury had determined to give appellant the maximum punishment possible—which they at that point believed to be either 99 years or life—before there was any discussion or consideration of the parole law. See *Tollett*, 727 S.W.2d at 719. Appellant argues that this finding is incorrect because Foreman Taylor, when asked by the prosecutor whether the jury had already made up its mind to assess 99 years or life when the note was sent out, replied "No, sir, it had not." This statement, however, contradicts Cynthia May's answer to the same question as well as the detailed story that Taylor recounted earlier in his testimony. Apparently the

trial court chose to believe May's answer and Taylor's earlier story. At a hearing on a motion for new trial, the trial judge is the trier of fact and his findings should not be disturbed unless abuse of discretion has been demonstrated. *Keady v. State*, 687 S.W.2d 757, 759 (Tex.Cr.App.1985). "Issues of fact as to jury misconduct raised at a hearing on a motion for new trial are for the determination of the trial judge, and where there is conflicting evidence there is no abuse of discretion where the motion for new trial is overruled." *Sneed v. State*, 670 S.W.2d 262, 266 (Tex.Cr.App.1984). Given May's and Taylor's testimony, we cannot say that the trial judge in this case abused his discretion.

■ We must now determine whether the jury's decision to assess a 99 year sentence instead of life in prison because of its erroneous interpretation of the parole charge was harmless under Rule 81(b)(2). The Court of Appeals concluded that these two sentences are, "as a practical matter", "equivalent sentences." *Tollett*, 727 S.W.2d at 718. "To the extent that these terms of imprisonment differ, ninety-nine years, the term chosen by the jury, is the lesser." *Id.* We agree with the Court of Appeals' analysis of the relative severity of the two sentences. Appellant was given a slightly lower sentence than he otherwise would have been because the jury's consideration of parole laws "contributed" to his receipt of a lesser punishment.[3] Is this the kind of "contribution" to punishment that the drafters of Rule 81(b)(2) envisioned as constituting "harm"?

■ We must answer that question in the negative. In *Harris v. State*, 790 S.W.2d 568 (Tex.Cr.App.1989), we recognized that Rule 81(b)(2) was the rhetorical and semantic equivalent of the harmless error standard announced by the Supreme Court for constitutional errors in *Chapman v. California*, 386 U.S. 18, 87 S.Ct.

3. At first glance, it may not be apparent that a ninety-nine year sentence is "less" than a life sentence. As the Court of Appeals stated, the two sentences are equivalent "as a practical matter." But there is a slight difference between them, and this difference, although largely technical, is nevertheless real. Theoretically, a nine-

ty-nine year sentence may be discharged during a prisoner's lifetime, but a life sentence will continue as long as he lives. Thus a felon serving a life sentence will always be on parole, while a felon with a ninety-nine year term could theoretically outlive his sentence.

824, 17 L.Ed.2d 705 (1967). *Harris, supra,* at 584.[4] In *Chapman,* the Supreme Court stated that "any error in admitting plainly relevant evidence which possibly could have influenced the jury adversely to a litigant cannot, under *Fahy,* be conceived of as harmless." *Chapman,* 386 U.S. at 23, 87 S.Ct. at 828, 17 L.Ed.2d at 710. This statement implies that the Court's notion of "harm" from an error necessarily includes some quantum of "adversity" to the complaining litigant. Any error which results in no such adversity should therefore be considered harmless.

Previous opinions of this Court provide further support for the idea that "contribution" in Rule 81(b)(2) means a contribution "adverse to the appellant." In *Arnold, supra,* Judge Clinton, writing for the Court, stated that

> the ultimate inquiry [in conducting a *Rose* harmless error analysis] is whether it is impossible to say beyond a reasonable doubt that considering declarations made by the trial court in its § 4 instruction law did not influence the jury *adversely to appellant* in assessing punishment.

*Arnold, supra,* at 300. (emphasis added). A requirement that a "contribution" to punishment for Rule 81(b)(2) purposes amount to an increase in punishment is also suggested by one line of cases setting forth the standards for harmfulness when jury discussion of parole occurs outside the context of a *"Rose"* instruction in the charge. See, e.g. *Sneed v. State,* 670 S.W.2d 262 (Tex.Cr.App.1984). These cases are expressly predicated on a resulting increase in the defendant's punishment—either an assessment of a longer term of years, or an assignment of prison time instead of probation.

■ Finally, we note that the error in this case should be held harmless because this case is analogous to a situation in which the jury, although considering the operation of the parole laws, assesses the minimum punishment available by law.

This is so because the jurors did not begin to discuss parole laws until they had narrowed the "range" of possible punishments that they would give to life or 99 years. Thereafter, when they discussed parole, they assessed the minimum sentence among those still under consideration—99 years. Even those among us who believe that it is normally impossible to apply a harmless error analysis to *Rose* errors will allow for harmless error when the minimum possible punishment is assessed. See *Arnold, supra,* dissenting opinion of Teague, J., at 330, 333.

For all of the foregoing reasons, we hold that the jury's discussion and attempted application of the parole law was harmless beyond a reasonable doubt. The judgment of the Court of Appeals is affirmed.

McCORMICK, P.J., concurs in the result.

TEAGUE, J., dissents.

CLINTON, Judge, dissenting.

"The evil to be avoided is the consideration by the jury of parole in assessing punishment." *Rose v. State,* 752 S.W.2d 529, at 535 (Tex.Cr.App.1987–1988), quoting *Clark v. State,* 643 S.W.2d 723, 725 (Tex.Cr.App.1982).

In *Arnold v. State,* 786 S.W.2d 295 (Tex. Cr.App.1990), after reprising our analysis of the § 4 instruction in *Rose,* supra, at 535, we translated the first part of its fifth paragraph, *viz:*

> "That is to say, when it comes to assess punishment the jury may deliberate on the content of what the trial court has just explained in the preceding four paragraphs in making its decision as to the number of years it will assess as punishment."

*Id.,* at 299. In the instant cause the jury did just that.

The judge had read to the jury the charge on punishment including § 4. Then jurors "selected a foreman, the charge was read and the jury deliberated." State's

---

**4.** The *Chapman* standard for harmless error had been previously enunciated by the Supreme Court in *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), although not with the extensive commentary provided in *Chapman.*

Brief, at 4. As juror Cynthia May testified, "I guess what it boiled down to was we were *taking into consideration a third of the sentence....*" Because "no mention of parole law was made during voir dire or final arguments," majority opinion, at 258 n. 2, the only source of the "one-third" rule alluded to by May is the § 4 instruction.

The § 4 instruction thus formed the very foundation for their deliberations and enabled them to figure how to compensate for the possibility of parole by assessing a long term of years. That they believed ninety-nine years would compensate more than life is beside the point.