**Affirmed and Majority and Dissenting Opinions filed October 31, 2019.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-17-00400-CR

_____

**HAPPY TRAN PHAM, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1096930**

## MAJORITY  OPINION

A jury found appellant Happy Tran Pham guilty of murder and assessed his punishment at confinement for life. From that conviction, appellant brings this appeal complaining of jury-charge error and ineffective assistance of counsel. We affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

On December 13, 2006, appellant entered the Cajun Kitchen restaurant in Harris County, Texas, and shot and killed Pierre Mai, the complainant. Appellant fled the restaurant and was not located until February 2016, ten years after the incident, when he was arrested. Appellant was tried and convicted, as noted above. Appellant filed a motion for new trial, which was denied. This appeal timely followed.[1]

## A. *Events Before the Shooting*

The trial evidence showed that before the shooting, appellant had dated Thuy Le. Before she began seeing appellant, Thuy Le dated the complainant. After Thuy Le's relationship with appellant ended, she resumed dating the complainant. Both the complainant and appellant were known to carry firearms.

Appellant testified that while he and Thuy Le were dating, he believed the complainant was stalking them. According to appellant, the complainant tried to assault him at the Window Café about four to six months before the shooting. The complainant approached the area where appellant and his friends were sitting and after making eye contact with appellant, the complainant tried to hit him. The police "broke it up." The next night, at a club, a friend of the complainant's approached appellant and asked about the situation from the night before. Appellant agreed not to escalate the situation any further.

On Halloween night of 2006, appellant went to Magic Island with Casey Mast. While going up the stairs, one of the complainant's friends bumped into appellant.

---

[1] Because the parties are familiar with the facts of the case and the evidence adduced at trial, we set forth the facts of the case necessary to advise the parties of the Court's decision and the basic reasons for it in light of the issues raised. *See* Tex. R. App. P. 47.1, 47.4. The facts recited are taken from the testimony and exhibits admitted at trial.

Huy Thai also was there. A fight started, and appellant recalled ending up on the floor with "at least 10 or 15 people surrounding [him.]" Promoters of the event and security broke up the fight, but appellant testified he was hit in the face. Casey testified that someone threw a bottle and hit appellant in the face, causing appellant to start "bleeding real bad." Appellant received 15 stitches in his forehead. Appellant owned a Heckler & Koch USP .40 gun and after that night he began carrying it more often.

Huy Thai's version of events differed. He testified that appellant bumped into a friend of his and "a little scuffle" began. To his knowledge, no one injured appellant by throwing a beer bottle at his head.

According to appellant, in the fall of 2006, prior to the incident at Cajun Kitchen, appellant changed his mind about the level of potential violence of complainant and Huy Thai, based on his belief that they were involved in a drive-by shooting, his observation of a vehicle riddled with bullet holes that appellant believed was involved in the drive-by shooting, and Huy Thai's association with a gang known as NCP, which stands for "Northside Chink Posse." Appellant recognized some of the people at Magic Island on Halloween night as also being involved with NCP. Huy Thai denied that he or the complainant were affiliated with NCP. Huy Thai denied that he and the complainant were involved in a drive-by shooting in November 2006. Detective Bart Nabors testified that he searched but did not find any evidence that Huy Thai and the complainant were involved in a drive-by shooting.

B.    *The Restaurant Shooting*

About 1:00 p.m. on the day of the restaurant shooting, appellant's cousin, Michael Tran, and his fiancée, Mai Pham, invited appellant to dinner at the Cajun Kitchen. Appellant called his brother, Long Pham, at 5:15 p.m. and asked Long to

3

go with him, but Long could not. At 5:25 p.m., appellant called Devon Le, who could not go either. Appellant then planned to stay home, but Billy Yang went to appellant's house, at which time appellant informed Billy Yang of his cousin's invitation, and they decided to go to the Cajun Kitchen. According to appellant, at that time he did not know the complainant would be there.

Michael Tran is appellant's cousin. Michael testified he arrived at the restaurant after 7:00 p.m. with Mai and their baby. Michael knew that after he invited appellant to the restaurant, appellant was informed the complainant and Thuy Le, a woman that appellant had previously dated,  might be at the Cajun Kitchen. Michael denied he sent the communication—he believed it was Mai who had contacted appellant—or that it was for the purpose of enticing appellant to come to the restaurant.

Michael saw appellant when appellant entered, and they nodded at each other. Michael testified that to his right he saw the complainant, who "kind of stood up, kind of reached for his waist. Blink of an eye, heard gunshots; and Happy [appellant] was running out." Michael never saw a gun and did not witness appellant do anything to provoke the complainant. Michael testified appellant "was just walking in." Michael said appellant was coming to him first, but then something got appellant's attention and appellant went in the other direction. Michael did not hear appellant curse or say anything."

Michael acknowledged that the video showed that at the time appellant was giving him a head nod, appellant already was reaching for his waistband and was not even looking at the complainant, but at Michael. Michael also agreed that appellant pulled out his gun and continued to walk, several steps, with the gun at his side while Michael was looking right at him. Michael admitted a lot of people were trying to get out of the way, but that he just continued "to look right in that direction."

4

Thuy Le was sitting at a table across from the complainant. She had her back to the door when appellant entered the restaurant. Thuy Le did not see him until he walked up to the table. Thuy Le testified that appellant was saying something like, "Motherf\*\*\*er, you in my hood" and "then he started shooting right away." Thuy Le saw appellant point the gun at the complainant, who was sitting down and eating, not trying to get up from the table. Thuy Le did not ever see the complainant pull a gun and point it at appellant; she stated the complainant was eating. Thuy Le testified the complainant was shot twice, and that after the shooting she saw a gun on the floor next to the complainant. Thuy Le described appellant as mad or angry but the complainant as calm.

Huy Le testified appellant walked in, "probably like one or two steps" and said, "What the f\*\*\* you doing in my mother\*\*\*ing hood?" Huy Thai saw appellant take the gun out of his waistband as he was speaking, and ran to get a gun kept under the restaurant register. Huy Thai gave the complainant a tap to the knee when he saw appellant walk in; the complainant was still sitting and Huy Thai did not see him get up from the table or reach for or pull a gun from anywhere. Huy Thai did not know the complainant was carrying a gun that night. After the shooting, Huy Thai went to the complainant and he saw a gun on the ground right next to the complainant, similar to the black gun he knew the complainant owned. Huy Thai did not know how the gun got on the ground; he did not see the gun fall or hear it hit the ground.

Thomas Tran was working as a cashier that night. Thomas saw appellant enter. When appellant was a few steps inside, Thomas saw him pull out a gun. Appellant did not speak with anyone else in the restaurant and appeared to be headed "in one direction." Appellant walked directly to the complainant's table and said, "Bitch, you're in my hood." The next thing Thomas heard was "gunshot." Thomas ran to get his gun. Appellant was walking toward the door but began running when he

5

grabbed the door handle. Thomas retrieved his gun and followed appellant outside. Appellant turned around and Thomas saw something black. Thomas began shooting at appellant, who did not return fire. Appellant had someone with him and was running towards a car. The car was backed in but not running and the lights were off. To the left of where appellant parked his car, there was an exit onto the street. Appellant got away on foot. After Thomas returned to the restaurant, he saw a gun near the complainant. Thomas picked up the gun and turned it over to police when they arrived.

Appellant admitted that he first learned the complainant would be at the restaurant as appellant was leaving his house. Appellant also said he was probably in the house and "still getting ready" when he received the text from Mai.

A text message was admitted into evidence from Mai to appellant informing him the complainant was at the restaurant. It states, "Hey happy just wanted to let you know your ex is here with her ex bf." Appellant knew "here" was the Cajun Kitchen. He did not change his mind about going there after receiving the text. When asked if he had a concern "that something might erupt" given events between him and the complainant in the past, appellant said, "Definitely." Appellant also testified he was "[o]n guard." Appellant denied that he went to the restaurant expecting "to get into a gunfight" and said that was not his desire. According to appellant, he thought the problem was over because Thuy Le had gone back to the complainant.

Appellant admitted to carrying a firearm when he walked into the restaurant and said he "was just on guard because, you know, [the complainant] was there." Appellant then denied expecting to have to use his gun that night. When asked again why he brought the gun, appellant replied, "All the drama that occurred prior to it, and, you know, his — he is just a volatile type of person. I didn't know what to expect from him sometimes." Appellant denied attempting to provoke violence.

Appellant testified that when he walked into the restaurant, one of his hands was in his pocket out of habit. According to appellant, he saw Huy Thai and the complainant, and the complainant had his hand "down"—appellant indicated where. Appellant said he avoided eye contact with that side of the room but heard a commotion, like a chair on tile, coming from that area. Out of the corner of his eye, appellant saw Huy Thai jumping up, and that is when appellant drew his weapon. Appellant then said that he did not draw just because of Huy Thai, but also because appellant had seen the complainant reach down when appellant walked in the door. Appellant claimed he did not draw his weapon to shoot, but to discourage a conflict. Appellant continued walking toward the complainant who "was kind of struggling with his gun." Appellant did not turn around and run because "[e]verything happened too quick." Appellant testified that he was trying to discourage the complainant's actions. He did not remember exactly what he said but recalled saying, "What the F are you doing?" According to appellant, he cursed at the complainant as a verbal warning and to deescalate the situation. Appellant testified that "at the end of [his] verbal warning," the complainant was "in the motion of pointing his gun at me." Appellant said he was holding his weapon down and had no intention of using it; he had not decided to use deadly force at that time. Appellant claimed he still was hoping to deescalate the situation. When asked, "if you're going to deescalate, why would you walk towards someone with a gun?" Appellant answered, "I didn't think he was going to point his gun at me." Appellant claimed he thought his actions would cause the complainant to stop.

Appellant said when he first saw the complainant's gun, the complainant was trying to draw it out of his waistband. The complainant did not immediately point his gun at appellant because he "staggered." Appellant decided to use deadly force when the complainant pointed his gun at appellant. Appellant did not feel he could

retreat at that point. Appellant said his first shot was very low. As the complainant was falling back, the complainant's gun came up again. Appellant said he "was staring down his barrel when I had to fire my second shot." Appellant recognized the complainant's gun as a black Glock.

Appellant testified that he ran outside and heard six or seven gunshots behind him. Appellant had parked his car in the first available spot. Appellant said there was not a strategic reason to park there and claimed that spot was actually a disadvantage because it was too close to the exit and if he left too fast, he would rip off his bumper. Billy Yang had the key because he was finishing a cigarette and was going to lock the car. Appellant heard hissing sounds from the engine and saw bullet holes in the hood. He ran to his cousin Michael's house.

Michael said he "cussed [appellant] out." He said appellant claimed he just reacted when the complainant pulled a gun on him. Appellant told Michael that he had disassembled the gun and thrown it in the gutter. Michael stated that he had no knowledge of appellant's whereabouts in the following years and did nothing to help him hide, and never attempted to give the police the account he gave in court.

At the restaurant, Sergeant Cruser recovered fired cartridge casings and two pistols. There were six .45 caliber casings and two .40 caliber casings. A 9-mm Glock 17 model semi-automatic pistol loaded with 9-mm rounds was recovered. No 9-mm cartridge casings were recovered. A Springfield Armory .45 caliber pistol was found. Kasi Kirksey, a firearms examiner for the Houston Forensic Science Center, testified the six .45 casings found at the restaurant were fired from the Springfield Armory .45 pistol. The two .40 casings were not fired from that gun but both .40 casings had been fired from the same weapon. No .40 caliber firearm was recovered. A cell phone was recovered from appellant's car that showed calls and text messages were made and received during the time period surrounding the shooting.

Sergeant J.T. Wyers retrieved the restaurant surveillance video from the night of the shooting. Two videos were admitted into evidence and published to the jury. The video with the earlier time stamp of 8:18 p.m., State's Exhibit 42, shows a woman exiting the restaurant on her phone and returning shortly thereafter. The other video, State's Exhibit 41, has a time stamp of 8:51 p.m. Wyers identified the person on the video that walked into the restaurant as appellant and identified appellant in court. Wyers testified the video shows appellant reaching for a weapon in his waistband. The complainant's table is off screen and he cannot be seen on the video. Appellant continues to walk towards the complainant's table. At a nearby table is appellant's cousin, Michael Tran. Tran and his family did not stay at the scene but left the restaurant after the shooting. No family or witnesses ever came forward on appellant's behalf.

An arrest warrant for appellant issued, and charges were filed. Appellant was not found at his residence, which was his parents' home. Appellant's parents and sister did not cooperate with Sergeant Wyers in his search for appellant.

Dr. Sarah Doyle, an assistant medical examiner at the Harris County Institute of Forensic Sciences, testified the complainant had a fatal gunshot wound that entered on the left side of his chest. His spine was perforated, which would have rendered the complainant immediately paralyzed from the waist down, preventing him from standing or moving his legs. The complainant also had gunshot wounds on both thighs. Doyle could not say with complete certainty that the same bullet went through both legs, but it was possible. Doyle could not determine which bullet struck the complainant first.

Detective Bart Nabors of the Houston Police Department, homicide division, interviewed appellant in February 2016. A video of that interview was admitted into evidence and published to the jury.

9

Nabors testified appellant told him that appellant walked into the restaurant alone and Billy Yang stayed outside. However, the restaurant surveillance video showed Billy Yang walked into the restaurant right behind appellant. Appellant said he did not turn himself in because he was waiting for a video to surface that showed the complainant pulled a gun on appellant. Nabors testified that there was no footage that would have shown the complainant's table; according to his investigation, there was not a camera in the restaurant that would have shown that angle. Appellant also told Nabors that he had seen the video of the shooting that was shown on "America's Most Wanted."

## II.    DENIAL OF MOTION FOR NEW TRIAL

In his first issue appellant claims the trial court abused its discretion by denying his motion for new trial. Appellant argues he was entitled to a new trial and punishment hearing based upon (1) jury charge error in the guilt/innocence phase; (2) ineffective assistance of counsel in the punishment phase; and (3) the trial court's informing the jury about parole law during the punishment phase.

### A.    *Charge-Error Argument*

Appellant contends the trial court erred in charging the jury during the guilt/innocence phase in two regards:

- He was entitled to a threat-of-force instruction in the jury charge pursuant to Texas Penal Code section 9.04; and
- The trial court erred in submitting a jury charge on "provoking the difficulty." *See Williams v. State,* 25 S.W. 788 (Tex. Crim. App. 1894).

Appellant then argues that cumulative error in the charge denied appellant his rights to due process and a fair trial.

10

1.    Threat-of-Force Instruction

The record reflects that during the charge conference appellant requested an instruction in accordance with Texas Penal Code section 9.04, which provides:

> The threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

Tex. Pen. Code § 9.04. The trial court denied the request. Appellant relies upon *Gamino v. State*, 537 S.W.3d 507, 508 (Tex. Crim. App. 2017), in support of his argument that he was entitled to the instruction. Because the facts of *Gamino* are not analogous to this case, appellant was not entitled to a threat-of-force instruction.

Gamino was arrested for aggravated assault with a deadly weapon after he pulled a gun out of his truck and pointed it at three men, allegedly saying "I got something for you." *Gamino*, 537 S.W.3d at 509. Gamino disputed that evidence and testified that he drew his gun in self-defense after the men threatened him and his girlfriend. *Id.* At trial, Gamino requested a self-defense instruction, which was denied. The Court of Criminal Appeals concluded that Gamino was entitled to an instruction pursuant to section 9.04. *Id.* at 510; Tex. Penal Code § 9.04.

The high court explained that section 9.04 is part of the law of self-defense and not a "third variety" of self-defense. *Gamino,* 537 S.W.3d at 510 n.12. Because Gamino was charged with using a deadly weapon, he was entitled to an instruction on non-deadly force self-defense under Penal Code section 9.31 if the evidence triggered application of Penal Code section 9.04. *Gamino,* 537 S.W.3d at 510. But section 9.04 only applies when "deadly force" was not used and section 9.32, deadly force self-defense, is inapplicable. *Gamino,* 537 S.W.3d at 511. Gamino did not

specify whether section 9.31 or section 9.32 applied and did not specifically ask for a section 9.04 instruction. *Id.* However, because the evidence triggered application of section 9.04, which "is not a separate statutory defense, but is encompassed within Section 9.31," the Court of Criminal Appeals held the trial court should have considered section 9.04 when considering Gamino's request for an instruction on self-defense. *Id.* at 511.

In the case at bar, the question for the jury was not, as in *Gamino*, whether the defendant's account of what happened supported a reasonable belief that his use of non-deadly force was justified. *See id.* at 512–13. Appellant received a self-defense instruction. Because he did use deadly force, rather than the threat of deadly force, he was not entitled to an instruction pursuant to section 9.04, in addition to the instruction on self-defense. *See Gamino*, 537 S.W.3d at 511–12.

Accordingly, we conclude the trial court did not err in denying the requested threat-of-force instruction.

### 2. Provoking-the-Difficulty Instruction

Appellant received a self-defense instruction. *See* Tex. Penal Code §§ 9.31, 9.32. However, the trial court also instructed the jury, without objection, that appellant may have forfeited his right to self-defense if he provoked the attack. *See* Tex. Penal Code § 9.31(b)(4). Subsection (b)(4) is a limitation on a defendant's right to self-defense. *Elizondo v. State*, 487 S.W.3d 185, 196 (Tex. Crim. App. 2016). A defendant forfeits his right of self-defense if he provoked the attack so as to have a pretext for killing the complainant under the guise of self-defense. *Id.*

A charge on provocation is required when there is sufficient evidence of the following:

(1) the defendant did some act or used some words that provoked the attack;

12

(2) such act or words were reasonably calculated to provoke the attack; and

(3) the act was done, or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other.

*Id.* A provoking-the-difficulty instruction should only be given when there is evidence from which a rational juror could find all three elements beyond a reasonable doubt. Otherwise, its inclusion in the jury charge constitutes an unwarranted limitation on the right of self-defense and is therefore erroneous. *Id.* The trial court does not assess the strength or credibility of the evidence but bases this determination only on whether evidence has been presented that could support a jury's finding of all three elements of provocation beyond a reasonable doubt. *Id.*

Appellant argues "[t]he trial court erred in instructing the jury on provocation because there was no evidence that Pham provoked the complainant as a pretext for killing him." Appellant does not contend there was no evidence from which a rational jury could find beyond a reasonable doubt that some act or words of his actually caused the attack or that his actions or words were reasonably calculated to provoke the attack. *See id.* at 199. We therefore address the third element: that there was some evidence from which a rational jury could find beyond a reasonable doubt that the act was done, or the words were used, for the purpose and with the intent of giving the defendant a pretext for killing the complainant. *Id.* at 200. To satisfy this element, there had to be evidence from which a rational jury could find beyond a reasonable doubt that appellant intended to provoke the complainant so that appellant could, under a guise of self-defense, harm the complainant. *Id.*

Here, appellant knew the complainant, and there was evidence from which the jury reasonably could believe appellant sought the complainant out. Specifically, the State presented evidence that appellant was told by family members, who were in the restaurant, that the complainant was there. The record contains testimony that

13

appellant walked into the restaurant, toward the complainant, pulled out his gun, pointed it at the complainant and, in some fashion, confronted the complainant for being in his "hood." The jury saw video of appellant pulling out his gun as he walked from the door toward the complainant. From the evidence, the jury rationally could have found that if the complainant pulled his gun out first, he was provoked into doing so in self-defense.

Viewing the evidence in a light most favorable to the instruction, we conclude that the trial court did not err, because there was sufficient evidence from which a rational jury could have found all three elements of provocation beyond a reasonable doubt. *See Zavala v. State*, 401 S.W.3d 171, 183 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (concluding the trial court did not err in including a provocation instruction where the defendant went to a place he knew the complainant was to confront her and, instead of leaving, kicked in two doors to reach her).

### 3. Cumulative Charge–Error Argument

Appellant claims the alleged errors in the charge discussed above violated his rights to due process and a fair trial. Having found no error in the court's charge, it is unnecessary to address appellant's cumulative charge-error claim.

### B. *Ineffective-Assistance-of-Counsel Argument*

Appellant contends he is entitled to a new punishment hearing based upon ineffective assistance of trial counsel. Appellant's specific complaints regarding trial counsel's performance are that he: (1) failed to request an instruction on sudden passion; and (2) failed to present mitigating evidence.

### 1. Sudden-Passion Instruction

Appellant claims trial counsel's failure to request the trial court to include an instruction on sudden passion during the punishment phase constituted ineffective

assistance. Appellant raised the issue in his motion for new trial, in which appellant asserted that trial counsel should have requested the instruction and had no tactical reason for failing to do so. The motion asserts appellant was entitled to the instruction based on his testimony that "the sudden actions of the complainant showed that he was armed; which put [appellant] in fear for his life." Trial counsel averred in his attached affidavit:

> At the time of the charge conference, the State's opening statement and the trial record provided an obvious basis for the jury considering sudden passion as an alternative to self-defense. My failure to request such an instruction was not based on any trial strategy. It simply did not occur to me to request it.

Although we appreciate trial counsel's candor, we disagree that the record supports a sudden-passion instruction.

Inherent in a claim of ineffective assistance is the requirement that appellant show trial counsel erred. *See Ramirez v. State*, 422 S.W.3d 898, 903 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("[T]o establish that the attorney's acts or omissions were outside the range of professionally competent assistance, appellant must show that counsel's errors were so serious that he was not functioning as counsel. *See Patrick v. State*, 906 S.W.2d 481, 495 (Tex. Crim. App. 1995)."). Absent any erroneous act or omission by trial counsel, the first prong of *Strickland* is not satisfied. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). We therefore first consider whether appellant, in fact, was entitled to a sudden-passion instruction.

A murder committed under the immediate influence of sudden passion arising from an adequate cause is a second-degree felony, and carries a maximum punishment of imprisonment for twenty years. *See* Tex. Penal Code § 19.02(d); *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013). "Sudden passion"

must be directly caused by, and arise from provocation by, the individual killed, and must arise at the time of the murder. *See* Tex. Penal Code § 19.02(a)(2); *Wooten*, 400 S.W.3d at 605. Passion that is solely the result of former provocation does not qualify. *McKinney v. State*, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005) (citing Tex. Penal Code § 19.02(a)(2)). Adequate cause is that which commonly produces a degree of anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection. *See* Tex. Penal Code § 19.02(a)(1); *Wooten*, 400 S.W.3d at 605.

The defendant has the burden of production and persuasion with respect to the issue of sudden passion. *See* Tex. Penal Code § 19.02(d); *Wooten*, 400 S.W.3d at 605. To justify a sudden-passion instruction, the record must support an inference that: 1) the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; 2) the defendant's sudden passion was in fact induced by some provocation by the deceased or another acting with the deceased, which provocation would commonly produce such a passion in a person of ordinary temper; 3) the defendant committed the murder before regaining his capacity for cool reflection; and 4) a causal connection existed between the provocation, passion, and homicide. *Wooten*, 400 S.W.3d at 605. The evidence supporting the submission of a sudden-passion instruction may be weak, impeached, contradicted, or unbelievable. *Id.* If the issue is raised by the evidence from any source, during either phase of trial, the defendant has satisfied the burden of production, and, if requested, the trial court must submit the issue in the jury charge. *Id.*

Sudden passion and self-defense are not mutually exclusive. *Beltran v. State*, 472 S.W.3d 283, 290 (Tex. Crim. App. 2015). Thus, a jury's rejection of self-defense at the guilt/innocence phase does not preclude submission of a sudden-passion issue at the punishment phase. *See Trevino v. State,* 100 S.W.3d 232, 242–43 (Tex. Crim.

App. 2003) (stating that "jury's rejection of self-defense at guilt innocence does not necessarily mean that, given an instruction on sudden passion at punishment, it would have rejected that theory as well").

Viewed in the light most favorable to appellant, his testimony establishes, at most, that he feared that the complainant would draw his pistol. However, "a bare claim of 'fear' " does not establish "sudden passion arising from adequate cause." *See Crunk v. State*, 934 S.W.2d 788, 795 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd); *see also Griffin v. State*, 461 S.W.3d 188, 193–94 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983)). Because no evidence demonstrates appellant acted under the immediate influence of terror, anger, rage, or resentment, he was not entitled to a sudden-passion instruction. Accordingly, trial counsel's failure to request such an instruction was not outside the range of professionally competent assistance and the first prong of *Strickland* has not been satisfied. *See Strickland*, 466 U.S. at 687.

2. Mitigating Evidence

Appellant further complains that trial counsel failed to offer evidence to mitigate punishment because (1) the witnesses who testified at the punishment phase of his trial, his brothers Dung Pham and Long Pham, were not prepared by his attorney to testify, and as a result were ineffective witnesses at his punishment hearing; and (2) potential witnesses who were available were not interviewed and called to testify by his counsel. Appellant contends a number of individuals were willing and available to testify at the punishment phase but that his trial counsel failed to interview or call them to testify. Attached to appellant's motion for new trial were affidavits from: Chan Pham (appellant's father), Cuc Tran (appellant's mother), Dung Pham (appellant's brother), Dr. Marenda Wilson-Pham (Dung's wife), Alicia Pham (appellant's sister), Tran Nguyen (appellant's girlfriend), Lee

Drones, Jr., Janet Drones, Donna Tran, Kristi Nguyen, Michelle Jardiolin, Dr. James Pham, DDS, Thao Ta, Julie Jean Nguyen, Andrew Mao, Patrick Pham, Leon Pham, Priscilla Pham, Tuan Nguyen, and Sandra Leon Martinez. Also attached was an affidavit from appellant and an affidavit from trial counsel.

Trial counsel stated in his affidavit that he believed appellant's friends and family who had stayed in contact with him during the time appellant was hiding and selling marijuana, would not make good punishment-phase witnesses because they would have been exposed to damaging cross-examination about their knowledge of appellant's activities in the ten years since the complainant's death. According to trial counsel's affidavit, he met with Long Pham and Dung Pham prior to their trial testimony, but there had been no "in-depth preparation." Further, in his affidavit trial counsel states that he understood appellant wanted to protect his parents from any "negative consequences" and that as of a week before trial, appellant had not kept his parents informed about his criminal case. Trial counsel averred that he was concerned appellant's "lack of contact with them for nearly a decade could be perceived negatively."

None of the affidavits attached to appellant's motion for new trial, including his own, reflect that any of the individuals listed above, with the sole exception of his girlfriend, Tran Nguyen, had any contact with appellant in the ten years since the complainant's death. The jury heard testimony that when appellant was arrested, the home he shared with Tran Nguyen had a strong odor of marijuana and two large bags of marijuana, $25,000 in cash, and two 9-millimeter guns were found in the home. Appellant admitted that he was selling marijuana.

Sergeant Wyers testified that none of appellant's family or friends ever came forward to assist in locating appellant. According to appellant's testimony,

18

unidentified friends of the family took him to Louisiana after the complainant's death.

Trial counsel's conclusion that his actions were not based on trial strategy is belied by his own affidavit in which he explained his reasoning as to why appellant's friends and family would not make good punishment-phase witnesses. His strategy is supported by the testimony and other record evidence. As the trial court stated in its findings, trial counsel faced the dilemma of calling friends and family to testify at the punishment phase when the witnesses either had no contact with appellant for the past ten years, possibly rendering any opinions of appellant's character stale, or possibly had knowledge of or were complicit in appellant's evading capture or had knowledge of appellant's drug-dealing, which could have resulted in unfavorable or detrimental testimony at trial. As trial counsel averred, his trial strategy was to establish that appellant acted in self-defense. Prioritizing appellant's self-defense claim over the presentation of mitigation witnesses that had no knowledge of appellant's current character, or possibly had knowledge of appellant's drug-dealing activities, or possibly had helped appellant elude capture, is a reasonable strategic decision. *See Humphrey v. State*, 501 S.W.3d 656, 664 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (focus on direct responsibility rather than a mitigation case at punishment may be "strategically defensible")); *Carter v. State*, 506 S.W.3d 529, 540–41 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). Considering trial counsel's affidavit as a whole, we conclude the trial court did not err in impliedly concluding that trial counsel's actions were not outside the range of professionally competent assistance and the first prong of *Strickland* has not been satisfied. *See Strickland*, 466 U.S. at 687; *Young v. State*, —S.W.3d—, 2019 WL 3210605, at *15–18 (Tex. App.—Austin 2019, no pet. h.) (not yet released for publication).

19

Moreover, to demonstrate ineffective assistance of counsel during the punishment phase of trial, a defendant must "prove that there is a reasonable probability that, but for counsel's errors, the sentencing jury would have reached a more favorable verdict." *Ex parte Rogers*, 369 S.W.3d 858, 863 (Tex. Crim. App. 2012) (quoting *Ex parte Cash*, 178 S.W.3d 816, 818 (Tex. Crim. App. 2005)); *see also Donald v. State*, 543 S.W.3d 466, 487 (Tex. App.—Houston [14th Dist.] 2018, no pet.). "It is not enough to show that trial counsel's error had some conceivable effect on the outcome of the punishment assessed." *Rogers*, 369 S.W.3d at 863.

As discussed above, and as the trial court noted in its findings, the evidence appellant claims would have mitigated his punishment came from either witnesses that had not had any contact with appellant in ten years, had assisted appellant in leaving the state after the shooting, or were aware of his drug-dealing activities. In light of the testimony and video evidence, which convinced the jury that appellant did not act in self-defense, we cannot conclude there is a reasonable probability that the jury would have reached a more favorable verdict but for counsel's alleged error.

C.    *Parole Law*

Appellant argues the trial court erred by permitting the jury to consider the manner in which parole law would be applied and by modifying the instruction permitted by section 4 of article 37.07 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 37.07. The punishment charge provided, in pertinent part:

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or thirty years, whichever is less, without consideration of any good conduct time he may earn. Eligibility for parole does not guarantee that parole will be granted.
>
> It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a

20

term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

During jury deliberations in the punishment phase, the jury sent the following written question to the trial court:

How many years does life represent?

Can you clarify the difference between a life sentence and a sentence of 99 years?

The trial court responded :

A defendant serving a life sentence is eligible for parole after 30 years have been served in prison. Eligibility for parole does not guarantee that parole will be granted. This would be the same for a defendant sentenced to 99 years in prison.

If a defendant is paroled, a defendant serving a 99-year sentence could be discharged if he lived long enough for the years in prison & on parole to total 99 years. A defendant serving a life sentence, if paroled, could never discharge (complete) his parole.

The record reflects that when the trial court informed the parties what his response would be, the State did not object. The following exchange then occurred:

THE COURT: How about from the Defense?

[Defense Counsel]: The Defense objects, Your Honor, and we believe and propose that the correct response would be to refer the jury to the Court's Charge.

THE COURT: Is there anything in my response that's incorrect?

[Defense Counsel]: I do not believe so, Your Honor.

THE COURT: Okay. Then I'm going to send it in. Thank you.

On appeal, appellant claims the response was erroneous for two reasons. First, that the trial court deviated from the statutorily mandated language of article 37.07, section 4. Second, that the trial court invaded the province of the Texas Board of Pardons and Parole, which makes all decisions concerning parole, mandatory supervision and discharge of sentence. *See* Tex. Gov't Code Chapter 508, Subchapter E. Regarding appellant's second reason, the trial court's reply does not address the manner in which the parole law may be applied to appellant by the Texas Board of Pardons and Parole.

We now consider appellant's first reason. The trial court's reply informed the jury that appellant would be eligible for parole in thirty years if given a sentence of either life or 99 years. The instruction already before the jury informed them that appellant would be eligible for parole after serving the lesser of half his sentence or thirty years. Thus, that information was already before the jury.

Further, the trial court told the jury that if appellant were paroled, he would be discharged in 99 years, if given a 99-year sentence, but if given a life sentence his parole would never be discharged. When the trial court responds substantively to a jury question during deliberations, that communication amounts to an additional or supplemental jury instruction. *Daniell v. State*, 848 S.W.2d 145, 147 n. 2 (Tex. Crim. App. 1993). Thus, the trial court provided additional information to the jury that a defendant given a 99-year sentence can be discharged from parole, but a defendant given a life sentence cannot. We presume, without deciding, that the trial court erred in instructing the jury on the law regarding the discharge of parole.

We now consider whether any such error would be reversible. If appellant objected to the error at trial, reversal is required if the error "is calculated to injure the rights of the defendant," which means that there is "some harm." *Almanza v.*

22

*State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). If the defendant did not object, reversal is required only if the error was so egregious and created such harm that the defendant was deprived of "a fair and impartial trial." *Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

Appellant's objection at trial failed to inform the trial court of any legal basis for the objection. Thus, error was not preserved. *See* Tex. R. App. P. 33.1(a); *Cudjo v. State*, 345 S.W.3d 177, 188 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *Valdez v. State*, 826 S.W.2d 778, 782 (Tex. App.—Houston [14th Dist.] 1992, no pet.). Accordingly, we will reverse only if the error egregiously harmed appellant. Egregious harm "must be based on a finding of actual rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). In determining whether egregious harm occurred, we review the error "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial court as a whole." *Almanza*, 686 S.W.2d at 171.

The trial court did not provide the jury with any additional information as to when or if appellant would be granted parole. Rather, the trial court told the jury that if a defendant serving a 99-year sentence is paroled, that defendant could be discharged if he lived long enough for the years in prison plus the years on parole to equal 99 years. This would only occur in the unusual event that a defendant lives 99 years after the defendant started serving the sentence. The trial court also informed the jury that a defendant serving a life sentence, if paroled, could never discharge the parole.

As discussed above, the jury heard and saw evidence from which it determined that appellant was not acting in self-defense, nor had the complainant provoked the difficulty, when appellant walked into the restaurant and fired at least

23

two shots from a .40 caliber handgun —one striking the complainant in the center of his chest—causing his death. During the punishment phase, the jury heard testimony that when appellant was arrested, two large bags of marijuana, $25,000 in cash, and two 9-millimeter guns were found. When appellant was interviewed, he admitted that he was selling marijuana. Further, the jury heard testimony that appellant admitted to having committed auto theft as a juvenile. The complainant's mother testified to the impact the death of her son and the delay in finding appellant had on her family. She stated that her family is bearing a "life sentence" of "sorrow, grief, and emptiness."

In his appellate brief appellant claims the State "made an issue about the difference between a life sentence and a 99-year sentence, no doubt contributing to the jury's question." The record reflects that in closing, the State said:

> Life or 99 years are pretty much the same thing in effect when it comes down to a sentence. It tells you what the parole law is, but I -- but I can't go into arguing it, it just tells you what it is. But I want you to know that life and 99 years are essentially the same thing.

Though the prosecutor's statement may have prompted the jury's question, the State did not tell the jury what the difference was or argue for a specific sentence based on parole law. Nor did the State address a defendant's discharge from parole.

Appellant claims the jury's note indicates they considered how parole law would be applied, which was found to constitute egregious harm in *Villarreal v. State*, 205 S.W.3d 103, 110 (Tex. App.—Texarkana 2006, pet. dism'd). In *Villarreal*, the charge did not include the mandatory parole instruction pursuant to article 37.07. *Id.* at 107. In response to a question from the jury, the trial court failed to correct the omission and provide the proper instruction. *Id.* at 105. That question was:

Is it possible to find out how many years he would actually serve compared to how many we sentence?

20 yrs =

15 yrs =

*Id.* Additionally, in *Villarreal,* the record did not show the trial court followed the required procedure of reading the jury's note in open court and allowing the defendant or his attorney the opportunity to object to the response. *Id.* (citing Tex. Code Crim. Proc. art. 36.27). The jury assessed the maximum punishment—twenty years' imprisonment. *Id.* For all these reasons, including but not limited to the fact that the jury was considering the impact of parole law on the defendant's punishment, the trial court found egregious harm. *Id.* at 110.

*Villareal* is distinguishable from the case at bar. Here, the trial court's charge included the mandatory parole instruction and the trial court followed the required procedure before responding to the jury's question. In this case, there is no difference as to when appellant would be eligible for parole as between a life sentence and a 99-year sentence, unlike the twenty or fifteen-year sentences being considered by the jury in *Villareal.* Appellant is eligible for parole in thirty years, as he would have been had the jury assessed a sentence of 99 years. Appellant will not ever be discharged from parole, but had he been sentenced to 99 years, he would not be discharged for 99 years.

In *Tollett v. State*, 799 S.W.2d 256, 259 (Tex. Crim. App.1990), the Court of Criminal Appeals agreed with the court of appeals' characterization that a 99–year sentence and a sentence of life in prison are, as a practical matter, equivalent sentences and to the extent they differ, 99-years is the lesser. *Tollett*, 799 S.W.2d at 259 (quoting *Tollett v. State*, 727 S.W.2d 714, 18 (Tex. App.—Austin 1987), *reversed by* 761 S.W.2d 376 (Tex. Crim. App. 1988)). The Court recognized that the difference between life and 99 is a theoretical one, stating, "[t]heoretically, a ninety-

nine year sentence may be discharged during a prisoner's lifetime, but a life sentence will continue as long as he lives. Thus a felon serving a life sentence will always be on parole, while a felon with a ninety-nine year term could theoretically outlive his sentence." *Tollett*, 799 S.W.2d at 259 n. 3. Considering all of the above, we conclude that, presuming the trial court erred in instructing the jury on the law regarding the discharge of parole, any such error did not result in egregious harm to appellant. *See Newsome v. State*, 829 S.W.2d 260, 266–68 (Tex. App.—Dallas 1992, no pet.).

For the reasons set forth above, we hold the trial court did not abuse its discretion in denying appellant a new trial on the grounds of charge error. Further, we hold the trial court did not abuse its discretion in denying appellant a new punishment hearing on the basis of ineffective assistance of counsel or charge error. Accordingly, we overrule issue one.

### III.    EVIDENTIARY HEARING ON MOTION FOR NEW TRIAL

In his second issue, appellant asserts the trial court abused its discretion in refusing to grant his request for an evidentiary hearing on the issues raised in the motion for new trial. Appellant argues there were matters not determinable from the record upon which he could be entitled to relief.

When a defendant presents a motion for new trial raising matters not determinable from the record, a trial court abuses its discretion if it fails to hold a hearing. *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). But live testimony is not required; a trial court may rule based on sworn pleadings and affidavits without oral testimony. *Id.* "It has long been held that a trial court may decide a motion for new trial based on sworn pleadings and affidavits admitted in evidence without hearing oral testimony." *Id.* Even contested factual issues may be decided by the trial court on affidavits. *Id.* (citing *Manzi v. State*, 88 S.W.3d 240, 244 (Tex. Crim. App. 2002)). The only specific matter appellant refers to is the trial

court's decision to take judicial notice that when asked if a sudden-passion charge were needed, defense counsel did not want that instruction given. Because we already have concluded that appellant was not entitled to such an instruction, the lack of oral testimony on this question, even if oral testimony or other evidence were warranted, would not afford appellant any relief.

The trial court held a hearing on appellant's motion for new trial at which the State, appellant, and appellant's current counsel were present. After considering the affidavits and arguments of both sides, the trial court denied the motion for new trial. Issue two is overruled.

## IV.   INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIM

Lastly, appellant contends he was prejudiced by trial counsel's ineffective assistance during the guilt/innocence phase of the trial. Appellant asserts trial counsel was deficient in that he failed to: (1) strike a juror during voir dire; (2) object to comments made by the State during voir dire and closing argument;  and (3) object to the jury charge's instruction on provoking the difficulty. Appellant claims he was prejudiced by these alleged deficiencies in trial counsel's performance.

A.   *Standard*

*Strickland*, 466 U.S. at 687, sets forth a two-prong test to determine ineffective assistance of counsel. Appellant must first show that counsel's performance was so deficient that he was denied counsel guaranteed him by the Sixth Amendment, and then appellant must demonstrate that counsel's performance "prejudiced the

defense. . . with errors. . . so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." *Id.*

B.    *Voir Dire*

Appellant clams trial counsel provided ineffective assistance during voir dire. Specifically, appellant complains that trial counsel failed to "clarify" whether Juror 23 could follow the law regarding self-defense if it resulted in loss of life. The record reflects several venirepersons, including Juror 23, were asked if, in the context of self-defense, they agreed with a statement by Juror 20 that there are no situations that justify a loss of life. The following exchange occurred between trial counsel and Juror 23:

> VENIREPERSON: Yeah, I kind of like I'm on the fence about it. Because to me, I always feel like people should have another option. Death shouldn't be the only option kind of thing.
>
> [Trial Counsel]: Uh-huh (affirmative.)
>
> VENIREPERSON: Really on the fence about it.
>
> [Trial Counsel]: And would you say that you would agree with the jurors on the front row who said that circumstances would be very important?
>
> VENIREPERSON: Yeah, definitely.
>
> [Trial Counsel]: So some circumstances could lead you to feel on one end of the spectrum?
>
> VENIREPERSON: Yes.
>
> [Trial Counsel]: As others have said, you may be very protective of all life?
>
> VENIREPERSON: Yes.

Contrary to appellant's claim, the record reflects trial counsel did continue to question Juror 23 so as to determine whether she could follow the law on self-defense even if it resulted in loss of life. Considering the entire exchange, Juror 23

28

agreed that it would depend upon the circumstances, which could lead her to feel the situation justified a loss of life, *i.e.,* the other end of the spectrum, that she was "really on the fence about it" or undecided, and that she was "very protective of "all life." Accordingly, trial counsel did "clarify" Juror 23's position.

To prevail on a claim of ineffective assistance of counsel, appellant must show that trial counsel erred. *See Ramirez v. State*, 422 S.W.3d 898, 903 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("[T]o establish that the attorney's acts or omissions were outside the range of professionally competent assistance, appellant must show that counsel's *errors* were so serious that he was not functioning as counsel. *See Patrick v. State*, 906 S.W.2d 481, 495 (Tex. Crim. App. 1995)."). Because the record does not support the complained-of omission, appellant has failed to satisfy the first prong of *Strickland*, 466 U.S. at 687.

C.    *Comments by the State During Voir Dire and Closing Argument*

Construing appellant's brief liberally, we conclude his complaint is that trial counsel was ineffective for failing to object because the State improperly opined as to appellant's guilt. *See* Tex. R. App. P. 38.9 (requiring courts to liberally construe briefs for substantial compliance with rules); *Crayton v. State*, 463 S.W.3d 531, 534 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

The first instance complained of occurred during voir dire, when the State said:

> My job is to do the right thing. Whatever justice requires. And some cases that may mean dismissing a case, and that has happened. In some cases it means going forward on a case, or trying to work a case out. But whatever it is, my job at the end of the day is to pursue the right course of action, right thing for everybody involved.

Next, appellant complains of trial counsel's failure to object to comments during the State's closing argument, italicized below:

You see him walk in, he takes a couple of steps, he pulls the gun. And this right here is taken right before he shoots. *I'm not even talking to you as a lawyer now, but just as a human being with reasonableness and perception. What part of that looks like self-defense to you?* He is in control the entire time. He knows who is up there, he takes the gun out, and he holds it down by his side. Are those the actions of somebody who is scared for their life?

The only authority appellant relies upon is this court's opinion in *Penrice v. State*, 716 S.W.2d 107, 109 (Tex. App.—Houston [14th Dist.] 1986, no pet.), from which he quotes:

> It is well settled that a prosecutor cannot inject his personal opinion of guilt into his argument; to do so is sufficient cause for reversal of the case. *Fowler v. State*, 500 S.W.2d 643 (Tex. Crim. App. 1973); *Baldwin v. State*, 499 S.W.2d 7 (Tex. Crim. App. 1973)). It is equally settled that the prosecutor may argue his opinions concerning issues in the case as long as the opinions are based on the evidence in the record and not as constituting unsworn testimony. *McKay v. State*, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985); *Sikes v. State*, 500 S.W.2d 650, 652 (Tex. Crim. App. 1973). To constitute reversible error, the argument must be extreme or manifestly improper, or inject new and harmful facts into evidence. *Kerns v. State*, 550 S.W.2d 91 (Tex. Crim. App. 1977); *Thomas v. State*, 519 S.W.2d 430 (Tex.Crim.App.1973).

Assuming, without deciding, the State's comments were improper opinions of appellant's guilt, we conclude appellant has not shown a reasonable probability that, but for trial counsel's failure to object to the comments, the result of the proceeding would have been different. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Appellant has not alleged or developed any argument as to how the outcome of his trial would have been different but for counsel's failure to object to the State's comments. *See Cardenas v. State*, 30 S.W.3d 384, 391 (Tex. Crim. App. 2000).

Considering all the evidence adduced at trial, we do not perceive how appellant could have suffered prejudice. Accordingly, we conclude the second prong of *Strickland* has not been satisfied. *See Strickland*, 466 U.S. at 687.

D.    *Provoking-the-difficulty Instruction*

Having found the trial court did not err in instructing the jury on provoking the difficulty, we cannot conclude counsel's failure to object to the instruction constituted ineffective assistance of counsel. *See Young v. State,* 991 S.W.2d 835, 839 (Tex. Crim. App. 1999) (holding counsel was not ineffective for failing to request instruction on necessity where defendant was not entitled to it); *Darkins v. State,* 430 S.W.3d 559, 572 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (same). Accordingly, the first prong of *Strickland* has not been satisfied. *See Strickland*, 466 U.S. at 687.

Appellant has not established the alleged errors by trial counsel during the guilt/innocence phase were so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment or that the results of his trial were rendered unreliable. *See Strickland,* 466 U.S. at 687.  We therefore overrule issue three.

## V.    CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.

/s/     Margaret "Meg" Poissant
        Justice


Panel consists of Chief Justice Frost and Justices Bourliot and Poissant. (Bourliot, J., dissenting).

Publish — Tex. R. App. P. 47.2(b).